**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

PENELOPE L. KNOWLES,        )
     Plaintiff,             )
                        )      Civil Action No. 2:07-cv-0063
v.                      )      Judge Nixon/Brown
                        )
MICHAEL ASTRUE,          )
Commissioner of Social Security,   )
     Defendant.            )

To:    The Honorable John T. Nixon,  Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final

decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income

(SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social

Security Act (the "Act") as amended. The case is currently pending on plaintiff's motion for

judgment on the administrative record. (Docket Entry No. 15). For the reasons stated below, the

Magistrate Judge recommends that plaintiff's motion for judgment be DENIED, and that the

decision of the Commissioner be AFFIRMED.

## I.  INTRODUCTION

Plaintiff filed her applications for DIB and SSI on November 12, 2002, alleging she became

disabled and unable to work on August 31, 2002, due to fibromyalgia and diabetes. (Tr. 57-59, 65).

1

Plaintiff's applications were denied initially and upon reconsideration. (Tr. 35-43). Plaintiff then

filed a request for a hearing by an Administrative Law Judge ("ALJ"). (Tr. 32). On June 9, 2005,

a hearing was held. (Tr. 402-437). Plaintiff, who was represented by counsel, testified. (Tr. 402-

437). On December 17, 2005, the ALJ issued a denial of benefits. (Tr. 16-21).

 The ALJ made the following findings:

1.     The claimant meets the nondisability requirements for a period of disability and Disability
       Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for
       benefits through the date of this decision.

2.     The claimant has not engaged in substantial gainful activity since the (amended) alleged
       onset date of disability.

3.     The claimant's Insulin-dependent diabetes mellitus (poorly controlled due to
       noncompliance); major depressive disorder–single episode, moderate; anxiety disorder not
       otherwise specified; fibromyalgia by report; and mild osteoarthritis are considered "severe"
       in combination based on the requirements in Regulations 20 CFR §§ 404.1520 and 416.920.

4.     These medically determinable impairments do not meet or medically equal one of the listed
       impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the claimant's allegations regarding her limitations are not totally
       credible for the reasons set forth in the body of the decision.

6.     The claimant has the residual functional capacity to lift and carry 20 pounds occasionally;
       and stand for up to two hours in a workday. She has the capacity to set realistic goals, plan
       independently, interact appropriately with others–including the general public, respond
       appropriately to changes in the workplace, take appropriate precautions for hazards in the
       workplace, handle simple and detailed work instructions, maintain concentration, and sustain
       a schedule within customary tolerances.

7.     The claimant's past relevant work as secretary/clerical did not require the performance of
       work-related activities precluded by her residual functional capacity. (20 CFR §§ 404.1565
       and 416.965).

8.     The claimant's medically determinable Insulin-dependent diabetes mellitus (poorly
       controlled due to noncompliance); major depressive order-single episode, moderate; anxiety-
       order disorder not otherwise specified; fibromyalgia by report; and mild osteoarthritis do not
       prevent the claimant from performing her past relevant work.

2

9.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision.  (20 CFR §§ 404.1520(f) and 416.920(f)).

On January 23, 2006, Plaintiff sought review from the Appeals Council.  (Tr. 11).  On July 11, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby rendering that decision the final decision of the Commissioner.  (Tr. 5-7)[1].  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.

## II.  REVIEW OF THE RECORD

Both the Plaintiff and the ALJ have completed extensive reviews of the facts in this matter.  (Docket Entry 16, Pages 1-8; Tr. 16-20).  As such, the Magistrate Judge will address the relevant facts in relation to each alleged statement of error rather than completing a third review of the relevant facts.  However, the Magistrate Judge has thoroughly examined the entire record.

## III.  CONCLUSIONS OF LAW

### A.   Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

---

[1]At that time, the AC considered the additional evidence provided by the Plaintiff, including an additional medical source statement provided by a treating physician.  (Tr. 8).

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

### B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)     If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.
>
> (2)     If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)     If the claimant is not working and has a severe impairment, it must be

4

determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)     Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner

---

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

## C. Plaintiff's Statement of Errors

Plaintiff alleges one broad statement of error: that the ALJ failed to properly evaluate the severity of Plaintiff's physical and mental impairments, as her combined impairments will not allow her to work. (Docket Entry 16, Page 8). More specifically, Plaintiff argues that the ALJ erred in rejecting the opinion of treating physician, Dr. Melvin Blevins, incorrectly assessed Plaintiff's fibromyalgia diagnosis and symptoms, failed to give adequate weight to the opinions of Plaintiff's mental health providers, and improperly rejected Plaintiff's testimony as less than credible regarding the severity of her symptoms. (Docket Entry 16, Pages 8-10).

The Commissioner responds that Dr. Blevins's first RFC assessment is consistent with the ALJ's RFC assessment and that Dr. Blevin's second RFC assessment is not supported by the Plaintiff's treatment records, that the ALJ correctly assessed the severity of Plaintiff's fibromyalgia symptoms according to both treatment records and her own conflicting reports of pain and fatigue, that the ALJ's assessment of Plaintiff's mental ailments is supported by not only a consultative licensed psychological examiner but also by the treatment notes of Plaintiff's mental health

6

providers, and finally, that Plaintiff's range of daily activities as well as her reports of pain in response to treatment do not support her allegations of severe pain and other alleged symptoms. (Docket Entry 22, Pages 8-14).

The Magistrate Judge will first address the consideration and weight given to the opinion of Dr. Blevins as well as the assessment of Plaintiff's fibromyalgia diagnosis and symptoms.

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(I)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency with the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

Additionally, it should be noted that a treating physician's statement that the claimant is

7

"disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (1984). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997)(citing 42 U.S.C.A. § 423 and 20 C.F.R. §404.1529(a)). Further, discounting the credibility of a claimant is appropriate to a certain degree where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id.*

Dr. Blevins performed a consultative examination of the Plaintiff in January 2003 at the request of the Defendant. (Tr. 224). Dr. Blevins opined that based upon Plaintiff's ailments, including a history of fibromyalgia with recurrent pain and joint stiffness throughout the body, as well as insulin dependent diabetes mellitus, hypothyroidism, musculoskeletal pain disorder, anxiety and depression, Plaintiff could occasionally lift 20 pounds, could not perform frequent lifts, could stand 2 hours per day and sit 4 hours per day. (Tr. 224-229).

After this consultative examination, Dr. Blevins began to treat the Plaintiff. (Tr. 353). From April 2003 through March 2005, Plaintiff was treated on a regular basis by Dr. Blevins for the above ailments, in addition to anxiety and depression. (Tr. 329-250). Dr. Blevins noted on several occasions that it was difficult to control Plaintiff's diabetes, in large part due to Plaintiff's noncompliance in taking her medications and maintaining her dietary restrictions. (Tr. 339, 340, 344, 345. See also Tr. 169, 175). Significantly, Dr. Blevins' records do not indicate any functional restrictions placed on the Plaintiff, other than one treatment note which indicates that Plaintiff should have a ground level apartment. (Tr. 348). Further, Plaintiff advised Dr. Blevins' that she

8

may be taking a lengthy trip to Europe as her son's father lived there. (Tr. 343). Dr. Blevins' did not advise against such travel. (Tr. 343).[3]

On February 25, 2005, at the request of Dr. Blevins, Plaintiff was seen by rheumatologist Dr. Sivalingam Kanagasegar. (Tr. 325-326). Up until this point, Plaintiff had been reporting to her various treating physicians that she had been diagnosed with fibromyalgia. However, all of her physicians noted that this diagnosis was either not well-documented or that Plaintiff's fibromyalgia was self diagnosed. (Tr. 168, 169, 172, 174, 175, 187, 188, 232, and 336). While Plaintiff claims on several instances to have been diagnosed as far back as 1987, she also reports as late as 2002 that she did research and believes that, based upon her symptoms, she has fibromyalgia. (Tr. 174, 175, 187, 325). It appears to the Magistrate Judge that Plaintiff's first fibromyalgia diagnosis by a physician was Dr. Kanagasegar during this consultative examination, who noted that she had diffuse soft tissue tender points of fibromyalgia present and opined that Plaintiff had chronic fibromyalgia syndrome, with no obvious evidence of any other connective tissue disorders. (Tr. 325-326).[4] Plaintiff reported that her pain was a five out of ten on the pain scale and that she had extreme fatigue. (Tr. 326). Dr. Kanagasegar discussed fibromyalgia syndrome with the Plaintiff in detail,

---

[3]Plaintiff testified at the hearing that she did travel to Europe in November 2003 with her son. (Tr. 420-421).

[4]While Plaintiff alleges that Dr. Ghaith Mitri, who evaluated Plaintiff in December 2002, found "18 trigger points" which indicated fibromyalgia, Dr. Mitri's notes are unclear to the Magistrate Judge. (Docket Entry 16, Page 2; Tr. 160). Dr. Mitri's diagnosis of "fibromyalgia vs. depression–crying, asking for disability" seems to indicate that Dr. Mitri was not certain that Plaintiff had fibromyalgia. It is also unclear if Dr. Mitri found 18 tender points as the form is not fully filled out and is unclear. (Tr. 160, 161). Further, in November 11/04, Dr. Blevins noted that while a rheumatologist had previously diagnosed Plaintiff with fibromyalgia, "this was not well documented." (Tr. 336). As such, the first clear diagnosis in the record by a physician is by Dr. Kanagasegar in February 2005. (Tr. 325-326).

9

advising her of the importance of regular exercise including aerobics and water exercise. (Tr. 326). He also prescribed Provigil for Plaintiff's extreme fatigue in the morning as well as Cyclobenzaprine to help Plaintiff sleep. (Tr. 326).

On August 23, 2006, approximately 8 months after the ALJ issued his opinion, Dr. Blevins completed an RFC assessment. (Tr. 391-394). Dr. Blevins had last treated Plaintiff in March 2005, therefore his RFC applied "for the period from January 22, 2003 through March 31, 2005." (Tr. 391). Dr. Blevins opined that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand at least 2 hours in an 8-hour workday, sit about 4 hours in an 8-hour workday, was limited in pushing and pulling in the upper and lower extremities, would frequently experience pain severe enough to interfere with attention and concentration, was incapable of even low stress jobs, would have to take 1-2 unscheduled breaks per day, would have "good" and "bad" days, would likely to be absent about 4 times per month, could occasionally climb, balance, kneel, crouch and crawl, was limited in manipulative functions, had no visual/communicative limitations, and should avoid even moderate exposure to extreme cold or heat, noise, dust, vibrations, humidity, hazards, odors/fumes, solvents/cleaners, cigarette smoke, and/or chemicals. (Tr. 391-394). This RFC assessment was considered by the AC, who declined to review the ALJ's decision finding that the information did not provide a basis for changing the ALJ's decision. (Tr. 5, 6, 8).

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Blevins and incorrectly assessed Plaintiff's fibromyalgia diagnosis and symptoms. (Docket Entry 16, Pages 8-9). In sum, Plaintiff advances that Dr. Blevins' assessments as well as Plaintiff's "main physical impairment, fibromyalgia," render Plaintiff is incapable of even sedentary work. (Docket Entry 16, Page 8).

10

The ALJ found that Plaintiff had the RFC to lift and carry up to 20 pounds occasionally and to stand for up to two hours in a workday. Therefore, the ALJ concluded that Plaintiff could return to her past work as a secretary. (Tr. 20). These are exactly the same restrictions as those listed in Dr. Blevins' first consultative assessment in 2003, the only one that was before the ALJ when he rendered his decision. (Tr. 224-229). Further, Dr. Blevins' treatment notes do not indicate any restrictions placed upon her activities, other than suggesting that she get a ground floor apartment. (Tr. 348). As to Dr. Blevins' second assessment, there appears to be no justification in Dr. Blevins' treatment notes for his change in RFC from his first opinion in 2003 to his second in 2006, covering the period from 2003 to 2005.

Additionally, the ALJ noted that Plaintiff reported to Dr. Kanagasegar that her pain was a five out of 10 on a 10 point scale, which suggests moderate pain. (Tr. 326). Further, Plaintiff herself has indicated that her pain level was not "in the high levels." (Tr. 431). Also, rather than restricting her activities because of her fibromyalgia, Dr. Kanagasegar advised her of the importance of regular exercise including aerobics and water exercise and prescribed medication for Plaintiff's fatigue. (Tr. 326).

Further, as noted by the ALJ, Plaintiff does operate a household independently, including cooking, cleaning, laundry, and caring for her minor child. (Tr. 19, 206, 267, 429, 431, 433). Plaintiff reported in April 2005 that she walks to her son's school *everyday* to pick him up and that she had home schooled him for a year. (Tr. 241, 434). Additionally, Plaintiff was capable of independent international travel with her minor child. (Tr. 415, 420). As noted by Plaintiff, Plaintiff did testify that she is capable of only short periods of activity. (Tr. 423). However, Plaintiff did testify that she was capable of carrying her groceries, including one containing a gallon of milk, and

11

that she was capable of reading and writing, often for extended periods of time. (Tr. 428, 433, 434).

Plaintiff further reported in March of 2005 that she was considering writing a book. (Tr. 263).

Plaintiff reported that she is able to take care of the basic daily needs for herself and her son, with

difficulty at times. (Tr. 267). This is consistent with the ALJ's RFC assessment and her finding that

she is capable of her past relevant work as a secretary, with certain accommodations. As such, the

Magistrate Judge finds that substantial evidence supports the ALJ's physical RFC assessment.

Plaintiff's next statement of error advances that the ALJ failed to give adequate weight to

the opinions of Plaintiff's mental health providers regarding her psychological impairments and

improperly rejected Plaintiff's testimony as less than credible regarding the severity of her

symptoms. (Docket Entry 16, Pages 8-10). Plaintiff references treatment notes where Plaintiff

reported that she was overwhelmed by simple daily activities such as preparing a meal or washing

dishes and that she was assessed to have marked limitations with respect to activities of daily living,

interpersonal functioning, and concentration and persistence. (Tr. 247, 256,257, 267, 275-277).

Plaintiff further notes that she received GAF scores in the range of 45-55. (Tr. 266, 273, 277, 285,

296 304, 310).

The ALJ based his mental RFC finding on the opinion of licensed psychological examiner,

Mary Kay Matthews, who conducted a consultative examination of the Plaintiff on December 30,

2002. (Tr. 204-207). Based upon the Wechsler Adult Intelligence Scale, Plaintiff was found to have

a Full Scale I.Q. Score of 117, which placed her in the high average range of intellectual functioning.

(Tr. 207). Further, Ms. Matthews opined that Plaintiff's current GAF was 70. (Tr. 208). She further

opined that Plaintiff could mentally handle simple and/or more detailed work-like procedures and

instructions, remember locations, and carry out these instructions. (Tr. 207). Additionally, Plaintiff

12

could mentally perform activities within a schedule, maintain regular attendance, be punctual, could sustain ordinary routine without supervision, could maintain concentration, could work in close proximity to other without being distracted by them, and could make simple work-related decisions. (Tr. 207). Additionally, Ms. Matthews found that Plaintiff could complete a normal work day and work week without interruptions from psychologically based symptoms, could perform at a consistent pace without an unreasonable amount of mental rest periods, could interact with the general public, could respond appropriately to supervisors, could maintain socially appropriate behavior, could use public transportation and travel to unfamiliar places, and could set realistic goals. (Tr. 207-208). In conclusion, Ms. Matthews stated that if the Plaintiff would receive appropriate treatment for her depression, she might function at a higher level. (Tr. 208).

Additionally, it appears that the treatment notes referenced by the Plaintiff are during the most severe period of Plaintiff's depression, which, according to Plaintiff's mental health providers, lasted less than six months in duration. (Tr. 276). Further, Plaintiff's treatment notes from her mental health providers indicate that she had only mild to moderate levels of depression and anxiety that were well controlled with medication. As to Plaintiff's GAF score, except during the period when her depression was most severe in December 2004, she consistently maintained a GAF score in the moderate range. (Tr. 208, 296, 204, 310).

On March 4, 2003, Plaintiff was reported to have only mild limitations in her daily living, interpersonal functioning, and concentration and persistence. (Tr. 308-310). During her initial intake assessment on March 27, 2003, Plaintiff reported that her "symptoms are fairly well under control with current medications, Lexapro and Xanax" as prescribed by her primary care physician. (Tr. 303). In September 2004, Plaintiff reported that she was med compliant and that she was able

13

to care for herself and her son with no assistance. (Tr. 293). In December 2004, Plaintiff was treated at a respite program during the time her depression was at it's most severe. (Tr. 274).[5] She reported feeling lethargic, being less able to function in daily life, having difficulty in interpersonal relationships, and feeling overwhelmed. (Tr. 272, 274). In January 2005, Plaintiff reported that with her medications and her stay in the respite program, "thing have been going better." (Tr. 271). Plaintiff reported that she set a few realistic goals for herself each day rather than letting herself get overwhelmed. (Tr. 271). She further reported that she was accomplishing more household tasks and her ability to concentrate had improved. (Tr. 270). In February 2005, Plaintiff reported continued difficulties but that she was able to meet the basic daily needs for herself and her son and that her medications continued to help her. (Tr. 265, 267).

On March 3, 2005, Plaintiff reported that while she had been tired a lot, she wanted to get into journalism and/or write a book. She expressed optimism about her future. (Tr. 263). While Plaintiff appeared during this interview with a "sad effect and depressed mood," she also reported having an easier time with household responsibilities and expressed a need for more social interaction. (Tr. 262). On March 9, 2005, Plaintiff expressed a need for better physical health and talked about beginning yoga classes at her church. (Tr. 258). On March 24, 2005, Plaintiff was reported to now have moderate levels of depression and anxiety. (Tr. 256). On March 30, 2005, Plaintiff reported that she "was doing well with her meds and feels that she is coming out of her depression." (Tr. 247).

In April 2005, Plaintiff's mental health providers noted that her mood "seems less depressed" and that Plaintiff reported that she "could feel herself coming out of her depression slowly." (Tr.

_____

[5]During this period, Plaintiff's son was visiting his aunt for the weekend. (Tr. 279-280).

14

245, 246). Further, while Plaintiff reported being physically drained, she also reported that she was "doing what needs to be done during the periods when her energy is higher" and that she would like more social interaction. (Tr. 246). On April 25, 2005, Plaintiff was reported as being able to function better on a day to day basis than she was several months ago, although she was still emotionally fragile. (Tr. 243). Plaintiff also reported that she walked to her son's school everyday to pick him up. (Tr. 241).

Given the above, it is clear that while Plaintiff's depression and anxiety symptoms were severe for a short time, these ailments are well controlled with medication. Further, while her symptoms affect her daily activities, she is able to care for both herself and her minor son without assistance. As such, the Magistrate Judge finds that substantial evidence supports the ALJ's mental RFC assessment.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc).

15

ENTERED this 2ND day of March, 2009.

_____
JOE B. BROWN
United States Magistrate Judge

16